Ekaterini **IOANNIDES, Individually, and as Personal Representative of the Estate of Dimitrios Ioannides, Deceased, et al.,** Plaintiffs,

v.

**MARIKA MARITIME CORP., et al., Defendants.**

**95 Civ. 1795 (LAK).**

United States District Court, S.D. New York.

June 12, 1996.

Paul S. Edelman, Kreindler & Kreindler, New York City, for Plaintiffs.

Patrick J. Bonner, Freehill, Hogan & Mahar, New York City, for Defendants Marika Maritime Corp., Astron Management Corp., Atlantic Maritime Enterprises, S.A. and Thomas Peter Pappas.

Michael D. Wilson, Michael J. Walsh, Pamela L. Milgrim, Kirlin, Campbell & Keating, New York City, for Defendant American Bureau of Shipping.

## MEMORANDUM OPINION

KAPLAN, District Judge.

On New Year's Day 1994, the M/V MARIKA foundered and sank in international waters some 700 miles east of Newfoundland with the loss of all hands. Plaintiffs—relatives and the personal representatives of five deceased crew members, all of whom were Greek nationals—here seek to recover under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 761 *et seq.*, the Jones Act, 46 U.S.C. § 688, and the general maritime law against the vessel's owner, others affiliated with it, and the American Bureau of Shipping ("ABS") on various theories. The defendants move to dismiss the action under the doctrine of *forum non conveniens* and, in some instances, on other bases.

### *Facts*

#### *Parties*

The plaintiffs, as noted, all are Greek nationals and family members of seamen who died in the sinking. They sue both individually and as personal representatives of the decedents.

Defendant Marika Maritime Corp. ("Marika") is a Liberian corporation which is alleged to have owned and operated the M/V MARIKA at all relevant times. (Cpt ¶¶ 2, 6–7) It employed the crew, including plaintiffs' decedents. (De Luca Aff. ¶ 8) It is important to note that the MARIKA did not carry cargo to or from, or engage in trade in, the United States while owned by Marika. (*Id.* ¶ 7) Defendants Atlantic Maritime Enterprises, S.A. ("Atlantic") and Astron Management Corp. ("Astron"), which are Greek and Connecticut corporations respectively, both performed various tasks and functions for Marika including assisting with financing, chartering, crewing, engineering and day-to-day operations. (Bonner Aff. ¶ 4) Atlantic, which has an office in the Greek port of Piraeus, handled crewing matters, maintenance, repairs, surveys and insurance matters. Astron was involved in financing and chartering. (De Luca Aff. ¶¶ 3–4) Thomas Peter Pappas is a Greenwich, Connecticut, resident who is alleged to control, and to be the *alter ego* of, Atlantic, Astron and Marika. (Cpt ¶ 13)

ABS is a not-for-profit classification society created in 1862 by act of the New York Legislature for the purpose of promoting the security of life and property at sea.[1] (Bour-

---

**1.** "Classification societies are defined as 'organized societies which undertake to arrange in- spections and advise on the hull and machinery of a vessel from its initial stages in new building

neuf Aff. ¶2) It has offices in more than eighty countries around the world, including an office in Piraeus, Greece. (*Id.*) It establishes and administers standards for plan review, construction survey and periodic survey of merchant ships and other marine vessels and structures. (*Id.*)

*The Events Here At Issue*

The last major repairs to the MARIKA were made during the period March 12 through April 16, 1993 in Piraeus (Kopsinis Aff. ¶9) at which time Dimitrios Lambros and Christos Nomikos, surveyors in ABS's Piraeus office, conducted several classification and statutory surveys[2] aboard the MARIKA. (Bessis Decl. ¶¶3, 19) Vasilios Spyridonos of Atlantic was present on behalf of Atlantic. (*Id.* ¶5) Assodivers, I & T Kalogeridis, Ultratest Marine Technical Bureau, and Electromarine Co. of Piraeus—all based in Piraeus, Greece—performed repairs on the vessel or assisted ABS. (*Id.* ¶¶6–20; Kopsinis Aff. ¶¶9–14)

The plaintiffs, to the extent revealed by the record, all signed on to the MARIKA in Piraeus at various dates on or after December 7, 1992. All entered into contracts of employment with Marika which were expressly subject in certain respects to the Greek Collective Agreement, a collective bargaining agreement,[3] and which provided that Greek law governed and "absolutely prohibited" recourse to courts of countries other than Greece. (Kopsinis Aff. ¶6 & Exs. B1, B2)

On December 24, 1993, the MARIKA loaded 140,000 metric tons of iron ore at Seven Islands, Canada, and sailed for Ijmuiden, the Netherlands, on December 27, 1993. (Cpt ¶25) As noted, the ship was lost with all hands on January 1, 1994. (*Id.* ¶26)

Shortly after the sinking, the vessel's owners, operators, agents and insurers engaged Spyridon Karakitsos, an attorney and partner in the Greek law firm Deucalion Rediadis and Sons. Karakitsos promptly negotiated settlements and obtained releases from three of the five plaintiffs in this case. As a portion of each settlement was allocated to claims under Greek Workers Compensation Law, each was approved by the Greek court. The settlements ranged from the U.S. dollar equivalents of $113,300 to $255,000. (Karakitsos Decl. ¶¶1–20) Plaintiffs now dispute the enforceability of the releases they gave.

*This Action*

Plaintiffs commenced this action in this Court in 1995. They seek recovery on the theory that the defendants were negligent in sailing the MARIKA into the North Atlantic in January and in failing to keep her in good repair (am cpt ¶28), that she was unseaworthy (*id.* ¶29), and that ABS was negligent in surveying the vessel and in allowing it to sail into the North Atlantic in January (*id.* ¶30).[4]

*Discussion*

Defendants' *forum non conveniens* motion proceeds in significant part from the premise that the crux of this action is the events that occurred, or did not occur, when the MARIKA was in Piraeus in March and April 1993 for survey and repair. All of the witnesses to those events, many of whom are not parties, as well as the plaintiffs, are in Greece. The Court, they point out, cannot compel any of the non-parties to come to New York for trial, and the cost of bringing any witnesses willing to appear would be exorbitant. They rely on the forum selection and choice of law clauses in the decedents' employment con-

---

and thereafter. The societies produce a certificate concerning the vessel's seaworthiness in accordance to the trade within which it is intended to, or does, work.' The societies' classification does not extend to manning or operation of a vessel." Damien L. O'Brien, *The Potential Liability of Classification Societies to Marine Insurers Under United States Law*, 7 U.S.F. Mar. L.J. 403 (1995) (quoting ERIC SULLIVAN, THE MARINE ENCYCLOPEDIA DICTIONARY 78 (1980)).

**2.** Classification surveys are surveys required by ABS rules. Statutory surveys are surveys re-

quired by the nation of a vessel's registration, here Liberia.

**3.** *See Damigos v. Flanders Compania Naviera, S.A.–Panama*, 716 F.Supp. 104, 106 (S.D.N.Y. 1989); *Kanagaratnam v. Vialogro Compania Naviera, S.A.*, No. 82 Civ. 2795(CSH), 1984 WL 735, at *3 (S.D.N.Y. Aug. 6, 1984).

**4.** Separate actions regarding the cargo lost with the MARIKA, brought by different plaintiffs, which had been pending before this Court have been settled.

tracts. They argue also that Greece has a far stronger interest in this matter than the United States, that the action is governed by Greek law, and that the Court should not needlessly undertake difficult choice of law issues that could be avoided by a *forum non conveniens* dismissal.

Plaintiffs perspective, not surprisingly, is entirely different. Although tacitly conceding the centrality of the events in Piraeus and the fact that the witnesses to those events all are in Greece, they contend that the MARIKA was owned and operated by the Pappas interests—Pappas, Astron, Atlantic and Marika—from a base in the New York area and flew the Liberian flag merely as a matter of convenience. They seek also to portray Pappas as an unscrupulous operator whose ships have had a dismal safety record and who seeks to hide behind a shield of foreign law. They therefore emphasize their contention that needed repairs were not made, presumably at the direction of Pappas or his New York area colleagues. They contend that U.S. law governs the matter, placing heavy reliance on *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). And they contend that the forum selection clause in the employment contracts is void under European law.

■ The principles articulated in *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), govern defendants' *forum non conveniens* motion notwithstanding that this is a maritime case in which a Jones Act claim is asserted. *Cruz v. Maritime Co. of Philippines,* 702 F.2d 47, 48 (2d Cir. 1983);[5] *Alcoa S.S. Co. v. M/V Nordic Regent,* 654 F.2d 147, 153, 159 (2d Cir.), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980). The Court must make a threshold determination whether an alternative forum exists in which the case may be heard. *E.g., Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 2, 102 S.Ct. 252, 265 n. 2, 70 L.Ed.2d 419 (1981); *see Gilbert,* 330 U.S. at 506–07, 67 S.Ct. at 842–43. Assuming there is such a forum, the Court then must balance a series of private and public interests in determining whether to retain the case or dismiss it in favor of an alternative forum:

"Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex', 'harass', or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

"Factors of public interests also have a place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." 330 U.S. at 508–09.

*Availability of Alternative Forum*

ABS has submitted an extensive affidavit of John D. Markianos–Daniolos, a Greek law-

---

**5.** Plaintiffs invite this Court to "reconsider" *Cruz.* It may not do so. Plaintiffs' argument would be addressed more properly to the Court of Appeals.

yer and partner in an Athens law firm, which demonstrates that the Greek courts are an available and suitable alternative forum. Plaintiffs do not contest this showing. Accordingly, the Court concludes that plaintiffs have an adequate alternative forum in Greece. *Cf. Effron v. Sun Line Cruises, Inc.,* 67 F.3d 7 (2d Cir.1995) (enforcing contractual selection of Greek forum).

### Private Interest Factors

■ As *Gilbert* indicates, the plaintiffs' choice of forum ordinarily is given great weight in deciding *forum non conveniens* motions. 330 U.S. at 508, 67 S.Ct. at 843. Doing so in the circumstances of this case, however, would be entirely inappropriate.

■ First, each of the plaintiffs in this case was a party to an employment agreement containing a forum selection clause that requires that any claims be brought in the Greek courts. Such clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972). Plaintiffs make virtually no showing that the contracts were products of overreaching. They concede the existence of remedies in the Greek courts, and litigation in Greece certainly would be convenient for the plaintiffs. Hence, the likelihood that the forum selection clauses would be disregarded appears to be slim.[6] *See Effron v. Sun Line Cruises, Inc.,* 67 F.3d 7, 9–10 (2d Cir.1995); *Damigos,* 716 F.Supp. at 106–07. In any case, the fact that plaintiffs agreed to sue only in Greece diminishes in some degree the weight that otherwise would be accorded to their choice of a United States forum. *Damigos,* 716 F.Supp. at 107.

The fact that plaintiffs are aliens independently undercuts the weight to be given their choice of this forum. *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2d Cir.1996). Even if plaintiffs were New Yorkers, their choice of forum would not be dispositive. *E.g., Scottish Air International, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2d Cir.1996); *Alcoa S.S. Co.,* 654 F.2d at 153; *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir.1981). As the Supreme Court said in *Piper Aircraft:*

> "When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." 454 U.S. at 255–56, 102 S.Ct. at 265–66.

Moreover, plaintiffs' presumed choice of this forum in pursuit of more liberal American attitudes toward damage awards is not entitled to substantial weight. *Id.* at 246, 102 S.Ct. at 261 (possibility of change in substantive law not entitled to substantial weight). Accordingly, while plaintiffs' choice of forum is entitled to some consideration, it is a far less significant factor than would be the case were they U.S. citizens.

In turning to the other private interest factors, the Court first pauses to focus on what the issues really are in this case. Given plaintiffs' claims, it is readily apparent that the surveys and repairs conducted in March and April 1993 will be a prime focus. So too will be the circumstances in which three of the five plaintiffs settled their claims with the owner interests and gave releases which, if sustained, presumably will bar their claims. All of these events, of course, occurred in Greece and all of the persons indicated by this record to have knowledge of any of them are located there. While they presumably could be deposed, credibility is likely to be an issue and depositions are not an adequate substitute where live testimony is reasonably

---

**6.** In a supplemental affirmation Plaintiffs claim that the forum selection clauses are unenforceable under a 1989 treaty which amends what is described as the 1968 Brussels Treaty between the countries of the European Community and that the European Community Treaty was approved by the Greek State. (Edelman Supp.Aff. at 5–6) Plaintiffs, however, have not supplied an affidavit or other appropriate material from which the Court could reach a conclusion on this issue. *See* Fed.R.Civ.P. 44.1. In any case, however, it is important to note that the need to determine the effect of European and Greek law on the forum selection clause in the employment agreements is itself a public interest factor weighing in favor of dismissal.

available. *See, e.g., Scottish Air Internation-al, Inc.,* 81 F.3d at 1233. There is no suggestion anywhere in plaintiffs' voluminous papers that there is anyone with knowledge of any of these matters in the United States, let alone within range of a subpoena issued by this Court. Thus, it is perfectly plain that the cost of producing willing witnesses for trial would be far less to all concerned were the case conducted in Greece and that this Court would lack any means of compelling live trial testimony from unwilling witnesses. Moreover, even the procurement of deposition testimony from unwilling witnesses would be fraught with all of the difficulties and delays inherent in the use of letters rogatory and other means of securing evidence from abroad.

Plaintiffs' response to this showing is twofold. As to the owner interests, it claims that the vessel in reality was owned by Pappas or entities that he controlled and was run from offices in Greenwich, Connecticut; the records and key executives, say plaintiffs, are in or within subpoena range of this District. They place principal reliance as to ABS upon the fact that its world headquarters is in New York.

Insofar as the case turns on the condition of the ship at the time it was in Piraeus and what transpired there, the bulk of the evidence—including everyone with personal knowledge—is in Greece. While Pappas and his colleagues, as plaintiffs suggest, may have received reports from Piraeus and made decisions on what to do and not to do, the bulk of the relevant evidence regarding the ship, the surveys and the repairs during this period is in Greece.[7] This is true as well for ABS, which handled the surveys out of its Piraeus office using Greek resident surveyors.

The controversy concerning the settlements with three of the plaintiffs adds to the strength of defendants' position on this issue. The releases were procured by a Greek lawyer in Greece from Greek releasors and the settlements approved by Greek courts. Plaintiffs' effort to set aside those releases manifestly depends exclusively on evidence available only in Greece, even putting aside, for the moment, any question as to the applicable law.

Accordingly, the private interest factors weigh substantially in favor of dismissal in favor of a Greek forum.

*Public Interest Factors*

The principal public interest factor to which the parties have devoted their attention is choice of law. Plaintiffs' position is that the Jones Act, 46 U.S.C. § 688, the DOHSA, 46 U.S.C. §§ 761 *et seq.,* and general maritime law govern this action while defendants argue that the governing law is likely to be that of Greece. While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action. *E.g., Damigos,* 716 F.Supp. at 108. Accordingly, at least a preliminary assessment of the law applicable is essential.

Section 1 of DOHSA gives a cause of action for wrongful death to the personal representative of a person whose death is caused by "a wrongful act, neglect, or default occurring on the high seas ..." 46 U.S.C. § 761. Section 4 permits the enforcement in federal courts of rights of action for wrongful death granted "by the law of any foreign State ..." *Id.* § 764. While it is not yet clear whether these two provisions are mutually exclusive or, instead, whether a court may give effect both to DOHSA and to foreign-created rights,[8] the question whether Section 1 applies at all is determined under the principles of *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and its progeny.

---

**7.** While there are documents in the New York area concerning matters such as financing of the MARIKA, it appears that all or most of the documents that might bear on the condition of the vessel have been destroyed. (Edelman Aff. pp. 8–9)

**8.** *Compare Noel v. Linea Aeropostal Venezolana,* 260 F.Supp. 1002, 1005 n. 18 (S.D.N.Y.1966) (noting issue and collecting cases), *with In re Air Crash Disaster Near Bombay, India,* 531 F.Supp. 1175, 1178 (W.D.Wash.1982) (provisions mutually exclusive); *Bergeron v. Koninklijke Luchtvaart Maatschappij, N.V.,* 188 F.Supp. 594, 597 (S.D.N.Y.1960), *appeal dismissed,* 299 F.2d 78 (2d Cir.1962) (same).

Under *Lauritzen,* the following factors determine choice of law:

"(1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of the foreign forum; and (7) the law of the forum." 345 U.S. at 579, 73 S.Ct. at 926.

In *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, the Court added the shipowner's base of operations to the list. And in *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the Court held that the same analysis governs the applicability of the Jones Act and the general maritime law.

Here, the law of the flag and the allegiance of Marika, the shipowner, is Liberia. The allegiance of the injured seamen and the place where the contracts of employment were made was Greece. There is an accessible Greek forum. The Court assumes *arguendo* that the shipowner's base of operations was the United States.

The place of the wrongful act, depending upon the facts, may be less straightforward. Certainly any negligence in the conduct of the surveys or in the making of repairs in Piraeus occurred in Greece. To the extent, however, that plaintiffs succeed in establishing that there is a causal connection between the sinking and decisions made in or instructions issued from Pappas' New York area offices, there may be a wrongful act in the United States. Nevertheless, application of the *Lauritzen–Rhoditis* analysis demonstrates that there is at least a substantial possibility that foreign law will govern the claims at Bar, either in whole or in part, quite apart from the employment contracts' provision choosing Greek law, which further buttresses defendants' position.

There is a final public interest consideration that bears more than passing mention. This is a case brought on behalf of Greek seamen who shipped aboard a Liberian vessel crewed by a Greek company which, wherever its ownership lay, was engaged exclusively in carrying cargos to and from non-U.S. ports. There are fora and remedies available to plaintiffs under the law of their country of domicile. Three of them already have settled their claims for sums which are substantial, even if they perhaps might seem low by American standards. There seems little justification for opening the courts of the United States—which are paid for by U.S. taxpayers and whose juries are composed of U.S. citizens asked to drop their everyday activities to serve—to claims in these circumstances even if, as plaintiffs stoutly argue, the ultimate base of operations of the vessel in question was the United States. That no doubt is why judges of this Court repeatedly have dismissed cases like this one—all brought by the same attorney—in favor of Greek fora. *E.g., Damigos,* 716 F.Supp. 104; *Tsangaris v. Elite Inc.,* No. 92 Civ. 7855(RPP), 1993 WL 267425 (S.D.N.Y. July 9, 1993); *Geralis v. Westwind Africa Line, Ltd.,* No. 84 Civ. 4310(DNE) (S.D.N.Y. Apr. 19, 1989); *Hasakis v. Trade Bulkers, Inc.,* 690 F.Supp. 260 (S.D.N.Y.1988); *Kassapas v. Arkon Shipping Agency, Inc.,* 578 F.Supp. 400 (S.D.N.Y.1984); *Doufexis v. Nagos S.S. Inc.,* 583 F.Supp. 1132 (S.D.N.Y. 1983); *Krimizis v. Panoceanic Navigation Corp.,* No. 83 Civ. 5667(JFK), 1985 WL 3834 (S.D.N.Y. Nov. 14, 1985).

*Rhoditis* is not to the contrary. The injury there in question occurred in the United States, and the vessel was engaged in carrying cargoes to and from U.S. ports. The interest of the United States in providing a remedy and a forum in that case was far greater than it is here, and it is important to note that the case did not even involve the question whether a *forum non conveniens* dismissal was appropriate. The public interest factors thus weigh heavily in favor of dismissal.

### Conclusion

Defendants' motions to dismiss on the ground of *forum non conveniens* are granted and the action dismissed on the following conditions:

1. Each defendant shall consent to (a) the institution and maintenance, within ninety days following the date of this order, of an action against it in the courts of Greece

based on the claims asserted in this action, and (b) service of any necessary process in such action upon its counsel of record in this case in lieu of any personal or other service that otherwise might be required.

2. Each defendant shall agree that the time from the commencement of this action until the expiration of ninety days following the date of this order shall be disregarded in determining the timeliness of any action contemplated by paragraph 1.

Each defendant shall file, on or before June 25, 1996, a document setting forth its acceptance of these conditions. The entry of judgment is stayed pending filing of such documents.

SO ORDERED.